1
2
3
4                       UNITED STATES DISTRICT COURT
5                      NORTHERN DISTRICT OF CALIFORNIA
6

7    C. JAY SMITH,                        Case No. 20-cv-04335-HSG

8                    Plaintiff,           **ORDER GRANTING IN PART AND
                                          DENYING IN PART DEFENDANTS'
9          v.                             MOTION FOR SUMMARY
                                          JUDGMENT AND PLAINTIFF'S
10   RALPH DIAZ, et al.,                  MOTION TO EXCLUDE EXPERT
                                          TESTIMONY**
11                   Defendants.
                                          Re: Dkt. No. 108, 117
12

13         Pending before the Court is Defendants' motion for summary judgment, Dkt. No. 117, and

14   Plaintiff's motion to exclude Defendant's expert testimony, Dkt. No. 108.  The Court held a

15   hearing on the motion.  Dkt. No. 130.  For the reasons detailed below, the Court **GRANTS IN**

16   **PART** and **DENIES IN PART** the motion for summary judgment and the motion to exclude

17   Defendants' expert testimony.

18   **I.     BACKGROUND**

19         Plaintiff C. Jay Smith is a transgender woman who has been housed in men's prisons for

20   decades.  *See* Dkt. No. 125-1 ("Smith Decl.") at ¶ 1; *see also* Dkt. No. 125-1, Ex. Q ("Smith

21   Depo.") at 210 (137:13–21).  The facts at issue in this case pertain to Plaintiff's incarceration at

22   San Quentin State Prison from 2013 to 2019, though she has been housed at the California

23   Medical Facility in Vacaville since June 2019.  *See* Smith Decl. at ¶¶ 2, 27.  The parties dispute

24   many of the underlying facts, but for purposes of the motion for summary judgment, the Court

25   construes the facts in the light most favorable to Plaintiff, as it must.  *See Matsushita Elec. Indus.*

26   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88.

27         Plaintiff alleges that she experienced gender-based harassment as well as physical abuse at

28

San Quentin. *See, e.g.*, Smith Decl. at ¶ 2; Smith Depo. at 210 (137:13–21).[1]  She alleges that Defendants (employees of the California Department of Corrections and Rehabilitation)[2] failed to protect her from this abuse, engaged in harassment themselves, and retaliated against her when she reported the sexual harassment.

In early 2013, shortly after arriving at San Quentin, Plaintiff was raped by an inmate referred to as "Cuba." *See, e.g.*, Smith Decl. at ¶ 2; Smith Depo. at 160, 173–74 (19:13–20:8, 38:11–39:5).  At the time, Plaintiff did not know his identity.  *See* Smith Depo. at 160, 173–74 (19:13–20:8, 38:11–39:5).  However, years later, Plaintiff recognized Cuba and his abuse continued.  *Id.*  In late 2018, he was placed in the cell next to Plaintiff.  *See* Smith Depo. at 160 (19:13–14).

Plaintiff explained that Cuba would grope Plaintiff, grabbing her breasts and buttocks as she walked by on a near daily basis, and would expose himself to her and make lewd comments.  *See id.* at 159, 161–62 (16:6–14, 20:5–7, 21:1–4).  When Plaintiff showered, Cuba would stand on the tier above the showers to watch and cat call.  *See id.* at 199–201 (101:20–102:16, 103:9–23).  At the time, there was nothing obscuring other inmates' views of the shower.  *See id.* at 195, 198 (96:8–21, 100:1–3).  Plaintiff said that the lock to her cell was repeatedly broken, and she found evidence that someone had entered her cell, masturbated on her pillow, and cut open her mattress.  *See id.* at 171–72 (35:6–25, 37:6–10).  She suspected it was Cuba, who was always nearby.  *Id.*  At one point, she also found a piece of fishing line tied around the leg of her bed, and Cuba would pull on it at night to disrupt her sleep.  *Id.* at 170–71 (34:3–35:5).

Plaintiff asked Defendant Haub to move her to a different cell because of Cuba's conduct, but Defendant Haub refused.  *See id.* at 161–62, 205 (20:9–20, 21:1–5, 128:5–10).  At one point, Defendant Haub told Plaintiff that she "was hallucinating."  *Id.* at 163, 170–71 (25:3–6, 34:24–35:5).  Plaintiff states that she reported Cuba's conduct several times to Defendants Haub and

---

[1] For ease of reference, the Court refers to the PDF pagination for exhibits unless otherwise indicated.
[2] Defendants include former CDCR Secretary Ralph Diaz; former San Quentin Warden Ron Davis; Officers T. Duke and M. Taylor; Lieutenants R. Feston, B. Haub, M. Bloise; and Sergeant Y. Franco.  *See* FAC at ¶¶ 18–25.

United States District Court
Northern District of California

Bloise, the lieutenants in the building, but they did nothing.  *See id.* at 167–68 (31:22–32:2, 32:22–25).  Plaintiff then went to Defendant Duke in the Investigative Services Unit ("ISU"), and although he said he would "check into it," he too did nothing to stop the harassment.  *See id.* at 207–09 (134:17–136:9).

A few days after her conversation with Defendant Duke, on March 6, 2019, Plaintiff told her mental health primary clinician ("MHPC") about Cuba and his ongoing harassment.  *See id.* at 164, 166 (27:1–20, 30:10–15); Dkt. No. 125-1, Ex. E at 86.  Plaintiff said "I know custody thinks I'm crazy."  *See* Dkt. No. 125-1, Ex. E at 86.  After consulting with her supervisor, the MHPC then told the West Block sergeant what Plaintiff had reported, while Plaintiff was still in her office.  *See id.*  In response, Plaintiff told the MHPC "I hope I won't get transferred for this."  Dkt. No. 125-1, Ex. E at 86.  When the MHPC asked why she was concerned, Plaintiff responded, "[b]ecause it's always us (transgenders) who get sent out."  *Id.*

**PREA Investigation**

This complaint prompted an investigation under the Prison Rape Elimination Act ("PREA").  *See* Smith Depo. at 159, 164 (16:1–3, 27:13–20).  When Plaintiff left the MHPC's office, Defendant Haub intercepted her and took her to ISU.  *See* Smith Depo. at 164–65, 174–75 (27:13–28:1, 39:23–40:1).  Defendant Haub left Plaintiff with Defendant Taylor.  *Id.* at 174–76 (39:23–40:15, 41:2–7).  Plaintiff alleges that once Defendant Haub left, Defendant Taylor threw Plaintiff against the wall, raised her shirt and bra before patting her down, handcuffed her, and put her in a holding cell in ISU.  *Id.* at 175 (40:4–15, 41:10–20).  Defendant Taylor told Plaintiff that he thought she was lying, she was too old, and was likely just jealous.  *Id.* at 177 (42:5–42:14).  Defendant Duke then entered the room and began recording the interview.  *See id.* at 176–78 (41:20–42:25).  During the interview, and in response to Plaintiff's question, Defendant Taylor said that locking Plaintiff up was "standard protocol."  *See* Dkt. No. 109-2 at ¶¶ 6–7, & Ex. B.  Plaintiff described Cuba's harassment, and explained that she had previously reported this and made notes about it in her cell.  *Id.*  Defendants laughed in response to some of Plaintiff's explanations.  *See id.*  Defendant Taylor asked Plaintiff if she had anything to drink or was on medication, and she said no.  *Id.*  Plaintiff said that Defendants would stop and re-start the

recording at times, taunting her in between the recordings. *See* Smith Depo. at 178 (44:1–20).

At the end of the interview, Defendant Taylor told Plaintiff that what she had reported met the requirements for a PREA investigation. *See* 109-2 at ¶¶ 6–7, & Ex. B. Defendant Duke appeared to push back on this in the background, saying, "[i]t only happened twice, alright? But the way you have it written, it's like it happened 50 to 60 times." *Id.* Defendant Taylor responded, "No, it's just that . . . I know the concern. I am going to stop the interview right here," and the audio recording stops. *Id.*

Defendant Franco then came in, and a second recording began. *See* Smith Depo. at 178–79 (45:21–46:8); Dkt. No. 109-2, Ex. C. In response to Defendant Franco's questions, Plaintiff reiterated that she had reported this conduct to Defendants Haub, Bloise, and Duke. *See* Dkt. No. 109-2, Ex. C. Defendant Franco asked Defendant Duke if Plaintiff had reported anything to him, and he appeared to acknowledge that Plaintiff had described Cuba reaching at her breasts, but "no touching . . . no nothing." *Id.* Defendant Taylor conducted the subsequent PREA investigation. *See* Dkt. No. 109-1, Ex. A. Plaintiff contends that Defendant Taylor used this as an excuse to investigate Plaintiff rather than her allegations. His PREA memorandum ultimately concluded that Plaintiff's report was "unfounded." *Id.*

Plaintiff contends that as a result of her PREA complaint, prison officials retaliated against her and issued three Rules Violation Reports ("RVRs") in rapid succession.

### Urinalysis RVR

Defendant Duke later explained that he had noticed during the initial PREA interviews on March 6 that Plaintiff was scratching at her elbow and "chewing like she had something in her mouth when she did not." *See* Dkt. No. 109-2 at ¶ 7. He said that these signs suggested to him "that she might be using crystal meth." *Id.* Following the interviews, Defendants Taylor and Duke therefore escorted Plaintiff to the Triage and Treatment Area in medical for a urine sample. *See id.* at ¶ 10; *see also* Smith Depo. at 178–79 (46:9–47:25). Plaintiff was put in an unlocked holding cell with no toilet. Smith Depo. at 178–79 (46:9–47:25). According to Defendant Duke, he asked Plaintiff the last time she had taken crystal meth, and she responded three days ago. *See* Dkt. No. 109-2 at ¶ 10. Plaintiff denies this and says she told them she had not taken any drugs.

United States District Court
Northern District of California

*See* Smith Depo. at 181 (48:14–20). Defendant Taylor ordered Plaintiff to provide a urine sample for a drug test. *See id.* at 179–80 (46:9–47:25). Plaintiff asked to use the bathroom to take the test, but he said no. *Id.* Plaintiff also said she was not refusing, but was entitled to water and three hours in which to take the test. *Id.* In response, Plaintiff states that Defendant Taylor raised a hand as if to strike her and said "Don't f*** with my time." *Id.* Plaintiff explains that she then signed the form he gave her under duress, indicating her refusal to submit to the urinalysis. *Id.*; *see also* Smith Decl. at ¶ 18. Afterward, Defendant Taylor told Plaintiff he would issue an RVR based on her refusal to provide the urinalysis unless she provided information on who was bringing in drugs. *See* Smith Depo. at 183 (52:1–21). Plaintiff said she didn't have any information. *Id.* Defendant Taylor prepared the Urinalysis RVR on March 7, 2019. *See* Dkt. No. 109-1, Ex. D.

### **Deadly Weapon RVR and Contraband RVR**

On March 11, 2019, Defendants Duke, Taylor, and Haub searched Plaintiff's cell. *See* Dkt. No. 109-1, Ex. B at 5. According to Defendants, they conducted the search because in the course of the PREA investigation several other inmates had indicated that Plaintiff kept contraband in her cell. *See* Dkt. No. 109-1, Ex. A; *see also* Dkt. No. 109-2 at ¶¶ 12–13; Dkt. No. 109-1, Ex. H at 244–45, 248–49 (156:23–157:1, 161:11–24, 162:16–18). Defendants contend that during the search Defendants Duke and Taylor found an inmate-manufactured weapon—a brick or rock placed into a piece of fabric—and a substance later confirmed to be marijuana. *See* Dkt. No. 109-1, Ex. B at 5–6; Dkt. No. 109-2 at ¶ 13; Dkt. No. 109-1, Ex. H at 248–50 (160:24–161:7, 162:16–163:7). Defendant Haub was called over to observe the contraband, and he instructed Defendants Taylor and Duke to take photographs and process the evidence. *See* Dkt. No. 109-2 at ¶ 14. Plaintiff contends that Defendants (1) placed the rock, a decorative statue and gift from a friend, into a piece of fabric from the handle of her electric piano to make it look like a weapon, and (2) planted the marijuana in her cell. *See* Smith Decl. at ¶¶ 21–24. Following the search, Defendant Haub placed Plaintiff in administrative segregation. *Id.* at ¶ 22. Plaintiff received one RVR for possession of a deadly weapon and one for possession of contraband. *See* Dkt. No. 109-1, Exs. B and C at 5–91. The Deadly Weapon RVR was referred to the Marin County District

5

1   Attorneys' Office, which prosecuted the charge for over a year before electing to drop the charges.

2   *See* Dkt. No. 125-1, Ex. I.

3       Plaintiff was ultimately found guilty of all three RVRs, resulting in a loss of good-time

4   credits and an increase to her classification score.  *See* Dkt. No. 109-1, Exs. B and C at 5–91.

5   Because Plaintiff's classification score increased, Plaintiff was no longer eligible to remain at San

6   Quentin, which is a Level II facility.  *See* Dkt. No. 109-1, Ex. F at 183–215.  Plaintiff was

7   therefore transferred in June 2019 to California Medical Facility, which is a Level III facility.  *Id.*

8   As described in more detail below, Plaintiff filed several grievances related to the PREA

9   investigation and the three RVRs.

10      **PREA Compliance**

11      In addition to the PREA investigation and RVRs, Plaintiff further alleges that she was

12  outspoken about the need for separate showers, out of view of other inmates, for transgender

13  women at San Quentin.  *See, e.g.*, Smith Decl. at ¶¶ 4–6.  As noted above, Cuba and other inmates

14  would watch Plaintiff and other transgender women while they showered.  *See* Smith Depo. at

15  195, 198–201 (96:8–21, 100:1–3, 101:20–102:16, 103:9–23).  Plaintiff became a member of the

16  Inmate Advisory Council, and the need for separate showers and privacy screens was a key issue

17  for transgender women at San Quentin at the time.  *See id.* at 189–91, 196–99 (87:12–88:2, 89:17–

18  22, 98:22–99:1, 100:12–101:10); *see also* Smith Decl. at ¶¶ 9–10.  Plaintiff repeatedly asked for

19  private showers or privacy screens, but these requests were denied.  *See* Smith Depo. at 191–94,

20  196–99 (89:17–92:14, 98:22–99:1, 100:12–101:10).

21      Plaintiff states that at one point in early 2019 she confronted Defendant Davis during a

22  meeting of the Inmate Advisory Council about the need for separate showers and the use of

23  privacy screens.  *Id.* at 193–94 (91:14–92:14).  In response, Associate Warden ("AW") Forncrook

24  threatened to issue Plaintiff an RVR if she was caught using a privacy screen.  *See* Smith Decl. at

25  ¶ 13.  Defendant Davis did not intervene and later confirmed that officers did have authority to

26  issue an RVR for use of a privacy screen in their discretion.  *Id.*; *see also* Dkt. No. 125-1, Ex. S at

27  237–39 (61:15–25, 63:7–24, 64:19–65:2).  Plaintiff also spoke with Defendant Bloise, who

28  responded to requests for separate showers by saying "[y]ou're no different from nobody else.  If

you are wanting [a shower] you shower with them." *See* Smith Depo. at 191–92, 203 (89:23–90:7, 111:2–19); *see also* Smith Decl. at ¶ 11.  Plaintiff did not, however, file any grievances related to the lack of PREA-compliant showers.

Plaintiff contends that PREA requires facilities to "implement policies and procedures that enable inmates to shower, perform bodily functions, and change clothing without nonmedical staff of the opposite gender viewing their breasts, buttocks, or genitalia, except in exigent circumstances or when such viewing is incidental to routine cell checks." *See* 28 C.F.R § 115.15(d).  However, CDCR's Department of Operations Manual ("DOM") in effect at the time changed the word "gender" to "biological sex." *See* Dkt. No. 125-1, Ex. C at 34–35, 39.  "Cross-Gender" was thus defined as  "[o]f the opposite biological sex." *Id.* at 36.  As an example, the DOM states that "Male Custody Staff patting down female Inmates is cross-gender searching." *Id.*  The DOM further states that "[e]ach institution shall enable offenders to shower, perform bodily functions, and change clothing without non-medical staff *of the opposite biological sex* viewing their breast, buttocks, or genitalia . . . ." *Id.* at 39 (emphasis added).  Likewise, under 28 C.F.R. § 115.42(f), "[t]ransgender and intersex inmates shall be given the opportunity to shower separately from other inmates."  The DOM added, however, that such showers would only be provided "upon request." *Id.*  The parties dispute whether San Quentin was in compliance with PREA.

*      *      *

Based on these allegations, Plaintiff brings four causes of action under 42 U.S.C. § 1983 against Defendants: (1) an Eighth Amendment claim against Defendants Diaz and Davis for failure to protect, *see* Dkt. No. 41 ("FAC") at ¶¶ 192–199; (2) a Fourteenth Amendment claim against Defendants Duke, Haub, Bloise, and Taylor for a violation of equal protection based on gender or transgender status, *see id.* at ¶¶ 200–208; (3) a Fourteenth Amendment claim against Defendants Feston, Haub, and Bloise for a violation of due process, *see id.* at ¶¶ 209–214; and (4) a Fourteenth Amendment claim against Defendants Duke, Haub, Bloise, Franco, and Taylor for retaliation based on Plaintiff's PREA complaint, *see id.* at ¶¶ 215–220.  Defendants move for summary judgment as to all claims, Dkt. No. 117, and Plaintiff moves to exclude the testimony of

1    Defendants' expert, Dkt. No. 108.

2    **II.    MOTION FOR SUMMARY JUDGMENT**

3        **A.    Legal Standard**

4        Summary judgment is proper when a "movant shows that there is no genuine dispute as to

5    any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

6    A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

7    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence

8    in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.*

9    But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

10   the materials in the record in the light most favorable to the nonmoving party, *Matsushita*, 475

11   U.S. at 587–88, and "may not weigh the evidence or make credibility determinations," *Freeman v.*

12   *Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514

13   F.3d 878, 884–85 (9th Cir. 2008).

14       The moving party bears the initial burden of identifying those portions of the record that

15   demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477

16   U.S. 317, 322–23 (1986). The burden then shifts to the nonmoving party to "go beyond the

17   pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and

18   admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *See*

19   *id.* at 324 (quoting Fed. R. Civ. P. 56(e) (amended 2010)). The nonmoving party must show more

20   than "the mere existence of a scintilla of evidence." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376,

21   387 (9th Cir. 2010) (citing *Liberty Lobby*, 477 U.S. at 252). "In fact, the non-moving party must

22   come forth with evidence from which a jury could reasonably render a verdict in the non-moving

23   party's favor." *Id.* (citing *Liberty Lobby*, 477 U.S. at 252). If the nonmoving party fails to make

24   this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477

25   U.S. at 323. If a court finds that there is no genuine dispute of material fact as to only a single

26   claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed.

27   R. Civ. P. 56(a).

28   //

United States District Court
Northern District of California

**B.    Discussion**

**i.    Exhaustion of Administrative Remedies**

Defendants first argue that Plaintiff failed to exhaust her administrative remedies against Defendants Diaz, Davis, Haub, and Feston because she did not file any grievance against them specifically.  *See* Dkt. No. 117 at 7–8.  The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The PLRA exhaustion requirement is mandatory, and requires "proper" exhaustion.  *See Woodford v. Ngo*, 548 U.S. 81, 84, 90–93 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id.* at 91– 92.  The grievance must contain at least enough factual specificity to put the prison on notice of the nature of the wrong for which the prisoner seeks redress.  *See Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir 2009).  The California regulations in effect at the time also required that the inmate "list all staff member(s) involved and [] describe their involvement in the issue."  Cal. Code Regs. tit. 15, § 3084.2(a)(3) (Barclays 2016) (repealed eff. June 1, 2020).

Plaintiff responds that (1) her existing grievances sufficiently identified and implicated at least Defendants Davis, Haub, and Feston; and in any event (2) she did not need to exhaust her administrative remedies by filing such grievances because they were effectively unavailable to her.  *See* Dkt. No. 125 at 15–16.

**a.  Specificity of Grievances**

Plaintiff appears to concede that she did not file any grievances directly against Defendants Diaz, Davis, Feston, and Haub.  *See* Dkt. No. 125 at 15–16; *see also* Dkt. No. 131.  Nevertheless, Plaintiff urges that she did not need to specifically name them because she sufficiently describes the harassment she faced as a transgender woman and the retaliation she experienced as a result of making a PREA complaint in her existing grievances.  *See* Dkt. No. 125 at 13.  This argument, however, sidesteps the requirements of § 3084.2(a)(3), which at the time required that Plaintiff

United States District Court
Northern District of California

1   identify the specific staff members involved in the issue.[3]  Cal. Code Regs. tit. 15, § 3084.2(a)(3)

2   (Barclays 2016) (repealed eff. June 1, 2020).  Plaintiff does not grapple with this language at all.

3       Instead, pointing to the Ninth Circuit opinion in *Reyes v. Smith*, 810 F.3d 654, 658–59 (9th

4   Cir. 2016), Plaintiff argues that notwithstanding § 3084.2(a)(3), she was not required to identify

5   all Defendants by name.  *See* Dkt. No. 125 at 13.

6       In *Reyes*, the plaintiff filed a grievance complaining of changes to his medication.  810

7   F.3d at 656.  He indicated that he was in significant pain and requested pain medication, but a

8   nurse only prescribed him aspirin.  *Id.*  The plaintiff brought a § 1983 claim, alleging that prison

9   officials had violated the Eighth Amendment through deliberate indifference to his medical needs.

10  *Id.*  Although the Plaintiff's grievance did not name two of the defendants, the Ninth Circuit found

11  that the plaintiff had nonetheless exhausted his administrative remedies because the grievance still

12  "plainly put prison officials on notice of the nature of the wrong alleged in his federal suit—denial

13  of pain medication by the defendant doctors."  *Id.* at 659.  The Court further reasoned that

14  "[p]rison officials [] plainly knew that the Pain Management Committee, of which [the unnamed

15  defendant doctors] were members, had decided [the plaintiff] should not receive the medication."

16  *Id.*

17      Despite Plaintiff's suggestion to the contrary, *Reyes* did not provide an all-purpose

18  exception to "proper exhaustion" and the requirements of Cal. Code Regs. tit. 15, § 3084.2(a)(3).

19  The Court did not address § 3084.2(a)(3), and instead relied on cases that predated the regulation's

20  amendment.  *See Reyes*, 810 F.3d at 659; *see also* footnote 2 *supra*.  But even setting that aside,

21  the *Reyes* court still required a sufficient connection between the plaintiff's grievance and the

22  unidentified defendant(s) to provide prison officials with "notice of the alleged deprivation" and

23  an "opportunity to resolve it."  *See id.* at 659.

24

25  _____

26  [3] The Court recognizes that the Ninth Circuit has suggested in prior cases that California's
    procedures only require that the grievance "describe the problem and the action requested," and
    not the names of those responsible.  *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014);

27  *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) (citing *Griffin*, 557 F.3d at 1120).  However,
    the Ninth Circuit in these cases appeared to rely on an earlier version of § 3084.2 that only

28  required an inmate to "describe the problem and the action requested," and said nothing about
    identifying individual staff member(s).  *See* Cal. Code Regs. tit. 15, § 3084.2(a) (Barclays 2009).

1          In her opposition brief, Plaintiff did not attempt to draw such connections for Defendants

2   Diaz, Davis, Feston, and Haub.  Accordingly, the Court directed the parties to file a chart

3   identifying Plaintiff's grievances, the conduct challenged on the face of the grievance, and a list of

4   which individuals are purportedly implicated by each of them.  *See* Dkt. No. 131.

5          **Defendant Feston.**  Plaintiff brings a Due Process claim against Defendant Feston.  *See*

6   FAC at ¶¶ 209–214.  She alleges that she was subjected to biased hearing officers during her RVR

7   disciplinary proceedings and biased investigators during the adjudication of her grievances, and

8   they interfered with her ability to present evidence and witnesses at the hearings.  *See id.* at ¶ 210.

9   Plaintiff points out that Defendant Feston was the Senior Hearing Officer who adjudicated the

10  Deadly Weapon RVR.  *See* Dkt. No. 109-1, Ex. B at 5–17.  In Grievance No. SQ-A-19-01127,

11  Plaintiff challenged the adjudication of this RVR, explaining that it was issued in "retaliation for

12  reporting sexual harassment."  *See* Dkt. No. 111, Ex. 5 at 64–93.  Plaintiff also explicitly stated

13  that she "disagree[d]" with the results found by the hearing officers.  *See id.* at 64.

14         The grievance was ultimately granted in part because the Third Level Reviewer determined

15  that Plaintiff had asked for a witness to be made available at the Deadly Weapon RVR hearing, but

16  he did not appear and his absence was not explained by Defendant Feston.  *See* Dkt. No. 111, Ex.

17  5 at 62–63.  Although Plaintiff did not raise this issue, the Third Level Reviewer still determined

18  that Plaintiff "was not afforded disciplinary due process" based on the witness's absence and the

19  Deadly Weapon RVR was reissued and reheard.  *Id.*  To the extent Plaintiff suggests that her Due

20  Process claim is based on Defendant Feston's failure to ensure that her witness was available at

21  the first hearing on the Deadly Weapon RVR, the Court finds that she has exhausted her

22  administrative remedies as to this claim.  Defendant Feston may not have been identified by name,

23  but his role as the hearing officer would have been clear to prison officials (including Defendant

24  Feston), and the Third Level Reviewer in fact addressed due process concerns regarding the

25  hearing directly.

26         None of the grievances, however, raise concerns about Defendant Feston's alleged bias.  In

27  her opposition brief, Plaintiff appears to argue that Defendant Feston's bias is apparent because he

28  was a hearing officer during the adjudication of the Deadly Weapon RVR as well as a First Level

United States District Court
Northern District of California

1    Reviewer on Grievance No. SQ-A-19-00868, in which Plaintiff complained that she was being

2    retaliated against for making a PREA complaint.  *See* Dkt. No. 125 at 13, 27; *see also* Dkt. No.

3    111, Ex. 3 at 17–24.  It is not clear how that establishes Defendant Feston's bias, and Plaintiff

4    provides no further insight.  But in any event, Plaintiff does not address how her grievances put

5    prison officials on notice of this alleged bias such that they had an "opportunity to resolve it."  *See*

6    *Reyes*, 810 F.3d at 659.

7        In a supplemental reply brief on qualified immunity, Plaintiff suggests that she exhausted

8    her administrative remedies as to all officials who reviewed her grievances, even though she did

9    not identify them until she filed this lawsuit.  *See* Dkt. No. 136 at 5.  But again, the grievances did

10   not notify prison officials that Plaintiff had independent problems with the manner in which

11   Defendant Feston handled Grievance No. SQ-A-19-00868 or his role in reviewing it.  *Accord*

12   *Gallardo v. Bourne*, No. 20-CV-09184 JSW, 2023 WL 3569997, at *11 (N.D. Cal. May 19,

13   2023); *Herrera v. Ortega*, No. 20-CV-02035 BLF (PR), 2023 WL 2277076, at *5 (N.D. Cal. Feb.

14   27, 2023).

15       **Defendant Haub.**  Plaintiff brings Equal Protection, Due Process, and Retaliation claims

16   against Defendant Haub.  *See* FAC at ¶¶ 200–220.  Plaintiff does not explain how she exhausted

17   all three claims as to Defendant Haub.  *See* Dkt. No. 109-1, Ex. B at 20–26.  According to

18   Plaintiff, Defendant Haub was involved in the March 11, 2019, search of her cell.  *See* Smith Decl.

19   at ¶¶ 21, 24.  Defendant Haub filled out the incident report following the search, and placed

20   Plaintiff in administrative segregation pending the outcome of the Deadly Weapon RVR.  *See* Dkt.

21   No. 109-1, Ex. B at 20–26.  Like with Defendant Feston, Plaintiff identifies Grievance No. SQ-A-

22   19-01127, in which she challenged the adjudication of the Deadly Weapon RVR.  *See* Dkt. No.

23   125 at 14; Dkt. No. 111, Ex. 5 at 64–93.  As noted above, Plaintiff filed a grievance, explaining

24   that the Deadly Weapon RVR was issued in "retaliation for reporting sexual harassment."  *See*

25   Dkt. No. 111, Ex. 5 at 64.  Plaintiff was interviewed by Defendant Haub as part of this grievance

26   process.  *Id.* at 68.

27       Only in response to the Second Level Decision, however, did Plaintiff raise concerns that

28   Defendant Haub was improperly involved in multiple steps of the process.  She noted that "[h]e

United States District Court
Northern District of California

1    did the incident report, the lock up order, now here he is again doing the appeal." *See* Dkt. No.

2    111, Ex. 5 at 65. She continued that "[s]urely there [are] more [lieutenants] at [San Quentin]

3    besides Haub." *Id.* The Third Level Reviewer did not address this concern. As discussed above,

4    the Third Level Reviewer ultimately concluded that the Deadly Weapon RVR should be reissued

5    and reheard based on the failure to make Plaintiff's witness available or explain his absence. *Id.* at

6    62–63. The Third Level Reviewer noted that Plaintiff had "added new issues and requests to the

7    appeal," but explicitly declined to address them, noting it was improper to expand the scope of the

8    grievance only on appeal. *See id.* at 63. Plaintiff did not file a separate grievance addressing

9    concerns about Defendant Haub's multiple roles in the RVR and grievance process.

10        In the supplemental grievance chart, Plaintiff suggests that other grievances still implicate

11    Defendant Haub. *See* Dkt. No. 131. But nothing in the grievances would have put prison officials

12    on notice of Defendants Haub's alleged misconduct or bias such that they could have addressed it

13    at the time.[4]

14        • In Grievance No. SQ-A-19-00868, Plaintiff alleged that she was being retaliated

15            against for making a PREA complaint. *See* Dkt. No. 111, Ex. 3 at 17–24. She

16            specifically named Defendants Taylor, Duke, and Franco, and she asked that these

17            officers be removed from the ISU and "reprimanded/demote[d]." *Id.* The

18            grievance did not state that Defendant Haub engaged in any of the alleged

19            misconduct Plaintiff now asserts, such as ignoring her reports of sexual harassment

20            or fabricating evidence as part of the search of her cell.

21        • In Grievance No. SQ-A-19-0090 and Grievance No. SQ-A-19-002259, Plaintiff

22            alleged that the Urinalysis RVR was wrong, and that Defendant Taylor mistreated

23            her. *See* Dkt. No. 111, Ex. 4 at 37–40; Dkt. No. 131-2, Ex. A. But again, nothing

24            about the content of the grievances indicates that Plaintiff was challenging

25            Defendant Haub's conduct. Plaintiff's deposition testimony further clarifies that

26

27    _____

28    [4] To the extent Plaintiff claims that other Defendants were biased against her because of the
      multiple roles they played in her RVRs and grievances, nothing in the grievances would have put
      prison officials on notice of this concern such that they could have addressed it at the time.

13

Defendant Haub was not present during the PREA interview or subsequent request for a urine sample. *See* Smith Depo. at 164–65, 174–76 (27:13–28:1, 39:23–40:15, 41:2–7).

Despite having a further opportunity to explain her theories, Plaintiff has failed to identify any grievance that sufficiently implicates Defendant Haub.

**Defendants Diaz and Davis.** Plaintiff also appears to acknowledge that the grievances did not explicitly implicate Defendant Diaz, the former CDCR Secretary, or Defendant Davis, the former Warden. *See* Dkt. No. 125 at 14. Instead, Plaintiff urges that because she is only seeking injunctive relief against them, she was not required to exhaust administrative remedies. *Id.* Plaintiff concedes that she is only suing Defendants Diaz and Davis in their official capacities. *Id.*; *see also* Dkt. No. 134 at 2; FAC at ¶¶ 18–19. The Ninth Circuit has explained that a plaintiff bringing an official-capacity suit "is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation." *See Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013). However, a plaintiff must "identify the law or policy challenged as a constitutional violation *and name the official within the entity who can appropriately respond to injunctive relief*." *Id.* (emphasis added). Defendants offer no response to *Hartmann*, and do not otherwise explain why exhaustion is required as to this claim.[5] Instead, Defendants appear concerned that Plaintiff may still be seeking monetary damages against Defendants Diaz and Davis. *See* Dkt. No. 117 at 10–11; Dkt. No. 41 at 5–6 (citing FAC at ¶ 199). Because Plaintiff indicates that she is only seeking injunctive relief, Dkt. No. 124 at 14, the Court need not reach this issue.

### b. Unavailable Remedies

Plaintiff also argues that exhaustion was not required as to some of her claims because administrative remedies were unavailable to her. *See* Dkt. No. 125 at 15. Plaintiff contends that she was explicitly told prison officials would retaliate against her if she continued to complain about PREA violations and transgender-specific policy violations. *See id.*

---

[5] Neither Defendant Diaz nor Defendant Davis appears to still be in their prior roles so it is not clear what injunctive relief Plaintiff could pursue against them.

The Supreme Court has held that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Ross v. Blake*, 578 U.S. 632, 636 (2016). "[R]emedies are not considered 'available' if, for example, prison officials . . . threaten retaliation for filing a grievance." *See Draper v. Rosario*, 836 F.3d 1072, 1078–79 (9th Cir. 2016). To show that a threat rendered the prison grievance system unavailable, "a prisoner must provide a basis for the court to find that [s]he actually believed prison officials would retaliate against [her] if [s]he filed a grievance." *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015). "If the prisoner makes this showing, [s]he must then demonstrate that [her] belief was objectively reasonable." *Id.* "That is, there must be some basis in the record for the district court to conclude that a reasonable prisoner of ordinary firmness would have believed that the prison official's action communicated a threat not to use the prison's grievance procedure and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance." *Id.*

Here, Plaintiff indicates that some CDCR employees were hostile to her as a transgender woman, and she received several threats from CDCR employees as a result. Plaintiff does not directly explain the scope of her argument. As detailed above, she filed several grievances related to this case. Plaintiff appears to suggest, however, that she did not have to exhaust administrative remedies as to any claims relating to Defendants' failure to comply with PREA's "cross-gender viewing" requirements. Accordingly, Plaintiff appears to argue that to the extent her Failure to Protect and Equal Protection claims are based on failure to comply with these PREA requirements, she was not required to exhaust administrative remedies.

In her declaration, Plaintiff states that sometime in 2018 she first approached Defendant Bloise to request separate showers from the men. *See* Smith Decl. at ¶¶ 4–5; *see* Smith Depo. at 191–92 (89:17–91:2). Defendant Bloise denied Plaintiff's repeated requests. *Id.* Plaintiff then went to Sergeant Dutton, not a party to this case, because Plaintiff "believed he would be more sympathetic to transgender women's safety concerns and more likely to comply with the rules than Defendant Bloise." *See id.* at ¶ 6. In approximately November 2018, Sergeant Dutton decided to allow transgender women to shower with cisgender men with disabilities. *Id.*; *see also* Smith Depo. at 191–93 (89:17–91:2). Plaintiff states that Defendant Bloise "was outspoken about

1    her disagreement" with this decision, and would continue to deny Plaintiff's requests to shower

2    separately or with the men with disabilities. *See* Smith Decl. at ¶ 11. She told Plaintiff that she

3    "was not different from the men and the transgender women should not get special treatment."

4    *Id.*; *see also* Smith Depo. at 203 (111:2–19).

5         Around this same time, in approximately December 2018, Plaintiff filed a grievance about

6    two officers searching and taking gender-affirming items from her cell, including bras and

7    makeup, and Defendant Bloise interviewed her about it. *See* Smith Decl. at ¶ 12; *see also* Dkt.

8    No. 125-1, Ex. D at 72. According to Plaintiff, Defendant Bloise said she would "give officers a

9    green light to retaliate against Plaintiff" if she did not withdraw the grievance. Smith Decl. at

10   ¶ 12. Plaintiff therefore wrote "resolved" on the grievance form and withdrew the appeal. *See*

11   Dkt. No. 125-1, Ex. D at 72. Plaintiff also contends that AW Forncrook, not a party to this case,

12   threatened to issue Plaintiff an RVR after she complained to him about the lack of privacy while

13   showering. *See* Smith Decl. at ¶ 13. Plaintiff points out that she also had witnessed two other

14   transgender women face retaliation for advocating for better treatment of transgender women,

15   which resulted in their transfers out of San Quentin in late 2018. *See id.* at ¶¶ 7–8. In short,

16   Plaintiff states that "[d]ue to the threats of retaliation from Lt. Bloise and an RVR from AW

17   Forncrook if I pursued grievances related to PREA and transgender-specific accommodations, I

18   ceased my attempts to grieve these issues for fear I would be targeted with RVRs." *See id.* at ¶ 14.

19        In response, Defendants point out that following these alleged threats Plaintiff still filed at

20   least six additional grievances. *See* Dkt. No. 129 at 3–4; *see also* Dkt. No. 111 ("Mosley Decl.")

21   at ¶¶ 8–15, & Exs. 3–8. None of the grievances discussed the lack of privacy while showering.

22   *Id.* But as touched on in Section II.B.i.a above, they did assert that Plaintiff was being retaliated

23   against due to the PREA complaint and her gender. *Id.* Plaintiff explained, for example, that her

24   treatment was a form of gender discrimination, and "I am a[n] example of what will happen to

25   anyone transgender who make[s] sexual harassment allegations." *See* Dkt. No. 111, Ex. 3 at 18,

26   22. In another grievance Plaintiff explained that "[o]f course 2 officers are going to tell the same

27   lie," "[e]specially if they have personal feelings about transgender people, which I know to be

28   true." *See id.*, Ex. 4 at 40. She further stated that "PREA law speaks loud and clear regarding

United States District Court
Northern District of California

16

1    retaliation." *Id.*

2        Plaintiff does not explain why she was intimidated from filing some grievances about

3    accommodations for transgender women but not intimidated from filing others about her personal

4    mistreatment as a transgender woman.  Nevertheless, Plaintiff states that the retaliation she

5    suffered based on the PREA complaint further underscored the dangers to her of raising

6    complaints about the treatment of transgender women and PREA violations at San Quentin.  *See*

7    Dkt. No. 125 at 15–16.  The Court further notes that at least according to Plaintiff, she did not

8    initially make the PREA complaint.  Her MHPC reported it after Plaintiff explained that she had

9    endured daily harassment from Cuba.  *See* Smith Decl. at ¶ 15; *see also* Dkt. No. 12-1 at ¶ 8, &

10   Ex. E at 86.  Plaintiff told her clinician that "I hope I won't get transferred for this" since "it's

11   always us (transgenders) who get sent out."  *Id.*  Plaintiff's grievances in 2019 are all related to her

12   treatment following this PREA complaint.  These grievances thus do not necessarily undermine

13   Plaintiff's contention that she was threatened—and therefore precluded—from filing other

14   grievances related to transgender accommodations.[6]

15       The Court finds that there is at least some evidence in the record to suggest that a

16   reasonable prisoner would have been deterred from filing further grievances based on prison

17   officials' failure to comply with PREA policies.  *See McBride*, 807 F.3d at 987.  This evidence,

18   however, turns entirely on credibility determinations.  Plaintiff states that she was repeatedly

19   threatened and feared the consequences of filing further grievances.  Defendants contend that

20   Plaintiff was never threatened and the grievance process remained available to Plaintiff.  Because

21   of this factual dispute the Court cannot grant summary judgment, but this does not end the inquiry.

22   As the Ninth Circuit has explained, "[i]f a motion for summary judgment is denied, disputed

23   factual questions relevant to exhaustion should be decided by the judge, in the same manner a

24   judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue."

25   *Albino v. Baca*, 747 F.3d 1162, 1170–71 (9th Cir. 2014) (en banc).  The parties will therefore need

26

27   ─────────────

28   [6] To the extent Plaintiff argues that she should be excused from filing any grievances related to any misconduct, she has not made this argument clearly, and neither the Court nor Defendants should have to speculate about the nature of Plaintiff's legal theories.

United States District Court
Northern District of California

to prepare for an evidentiary hearing in which the Court will resolve these disputed facts and the outstanding questions of exhaustion.

*     *     *

The Court **GRANTS** the motion for summary judgment on exhaustion grounds as to Defendant Haub and as to any claims that Defendants deprived Plaintiff of her due process rights due to bias, but otherwise **DENIES** the motion as to exhaustion. For completeness, the Court continues to address Defendants' remaining arguments, even though an evidentiary hearing is necessary to evaluate exhaustion fully.

### ii.   Qualified Immunity

Defendants next argue that they are entitled to qualified immunity. *See* Dkt. No. 117 at 26–28. The parties provided limited briefing on this threshold issue. The Court therefore requested further briefing, particularly as to whether the constitutional rights that Plaintiff alleges were violated were clearly established at the time. *See* Dkt. No. 130.

Part of the challenge in addressing qualified immunity here is that it is not entirely clear what specific conduct Plaintiff believes violates any particular constitutional right. She alleges that each Defendant engaged in various misconduct, some or all of which may form the basis of Plaintiff's claims. Even now, with additional briefing, there is a scattershot approach to Plaintiff's claims. The Court endeavors to find some clarity below.

### a.   Legal Standard

The doctrine of qualified immunity protects government officials from liability for civil damages as long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is supposed to give government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). In theory, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation omitted). To determine if an officer is entitled to qualified immunity, the Court considers whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *See Pearson v. Callahan*, 555 U.S. 223, 232

1   (2009).  Courts may choose which prong to address first.  *Id.* at 236.  Under either prong, though,

2   the Court may not resolve genuine disputes of fact in favor of the party seeking summary

3   judgment on qualified immunity grounds, and must, as in other cases, view the evidence in the

4   light most favorable to the nonmovant.  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

5          Under the second prong of the qualified immunity inquiry, "[a]n officer 'cannot be said to

6   have violated a clearly established right unless the right's contours were sufficiently definite that

7   any reasonable official in [his] shoes would have understood that he was violating it.'"  *City &*

8   *Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765,

9   778–79 (2014)).  While this does not "require a case directly on point, [ ] existing precedent must

10  have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.

11  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high

12  level of generality."  *Id.* at 742.  The Supreme Court has further instructed that, where "the result

13  depends very much on the facts of each case . . . officers are entitled to qualified immunity unless

14  existing precedent 'squarely governs' the specific facts at issue."  *Nicholson v. City of L.A.*, 935

15  F.3d 685, 695 (9th Cir. 2019) (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018)); *cf. D.C. v.*

16  *Wesby*, 583 U.S. 48, 64 (2018) ("[W]e have stressed the need to identify a case where an officer

17  acting under similar circumstances . . . was held to have violated the Fourth Amendment."

18  (quotations omitted)).

19         Put another way, "[i]t is insufficient for a legal principle to merely be 'suggested by then-

20  existing precedent.'"  *Perez v. City of Fresno*, 98 F.4th 919, 924 (9th Cir. 2024) (quoting *Wesby*,

21  583 U.S. at 63).  Instead, "'[t]he precedent must be clear enough that every reasonable official

22  would interpret it to establish the particular rule the plaintiff seeks to apply.'"  *Id.*; *see also*

23  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) ("A right is clearly established when it is

24  'sufficiently clear that every reasonable official would have understood that what he is doing

25  violates that right.'").  The Ninth Circuit "routinely rel[ies] on the intersection of multiple cases

26  when holding that a constitutional right has been clearly established," on the ground that "[t]his

27  approach is required by the Supreme Court's instruction that qualified immunity is improper

28  where a legal principle has a sufficiently clear foundation in then-existing precedent."  *Polanco v.*

United States District Court
Northern District of California

19

1    *Diaz*, 76 F.4th 918, 930, n.8 (9th Cir. 2023) (cleaned up).

2                              **b.  Analysis**

3                         **1.  Official Capacity Claims**

4            As an initial matter, Plaintiff argues that qualified immunity does not apply to the official

5    capacity claims against Defendants Diaz and Davis.  *See* Dkt. No. 134 at 2–3.  The Ninth Circuit

6    has explained that "[q]ualified immunity is only an immunity from a suit for money damages, and

7    does not provide immunity from a suit seeking declaratory or injunctive relief."  *Hydrick v.*

8    *Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012).  As with their exhaustion argument, Defendants

9    appear concerned that Plaintiff is somehow reserving a claim for money damages against

10   Defendants Diaz and Davis.  *See* Dkt. No. 135 at 5–6.  But Plaintiff has clarified that she is only

11   seeking declaratory and injunctive relief from them.  *See* Dkt. No. 136 at 2.

12                        **2.  Equal Protection Claim**

13           At least part of Plaintiff's Equal Protection claim appears to turn on Defendants' failure to

14   comply with PREA—specifically, its requirements to protect inmates from cross-gender viewing

15   during showers and while performing bodily functions.  *See* FAC at ¶ 203 ("The Count II

16   Defendants discriminated against and harassed Plaintiff by refusing to follow transgender-specific

17   PREA shower regulations . . . .").  Defendants argue that PREA does not create a federal right and

18   cannot form the basis of a claim under § 1983.  *See* Dkt. No. 135 at 5–7.  While district courts

19   have repeatedly found that PREA does not provide a private right of action, *see Parker v. Garcia*,

20   No. 123CV01583KESEPGPC, 2024 WL 1641899, at *3 (E.D. Cal. Apr. 16, 2024) (collecting

21   cases), Plaintiff is not suing directly under PREA for noncompliance with the act.  Rather,

22   Plaintiff is bringing a Fourteenth Amendment claim for a violation of equal protection based on

23   gender or transgender status.  *See* FAC at ¶¶ 200–208.  In other words, Plaintiff contends that

24   CDCR's policies, which did not prevent cross-gender viewing of transgender women, violated the

25   Equal Protection Clause of the Constitution.  *See* Dkt. No. 125 at 23 (noting such policies

26   "subject[] transgender women at men's facilities to differential treatment by forcing them to

27   shower in view of people of other genders, as opposed to women at women's facilities who are not

28

United States District Court
Northern District of California

1    viewed by people of other genders while showering").[7]

2          Defendants do not suggest that such conduct did not violate a clearly established right.  *See*

3    Dkt. No. 135 at 7–10.  And as Plaintiff points out, the Ninth Circuit has recently rejected such an

4    argument.  In an unpublished memorandum, the Ninth Circuit recently affirmed the denial of

5    qualified immunity where Idaho's Division of Medicaid excluded coverage for surgeries to treat

6    gender dysphoria but granted coverage for the same surgeries to treat other medical conditions.

7    *See M.H. v. Hamso*, No. 23-35485, 2024 WL 4100235, at *1 (9th Cir. Sept. 6, 2024).[8]  The court

8    concluded that the defendant "violated the transgender [Medicaid beneficiary's] clearly

9    established right to be treated equally to other, non-transgender Medicaid beneficiaries when

10   seeking Medicaid coverage for the same medically necessary surgeries."  *See id.* at *2.  In

11   reaching this conclusion, the court relied on its prior case law in which it explained that in equal

12   protection cases "[t]he constitutional right to be free from such invidious discrimination is so well

13   established and so essential to the preservation of our constitutional order that all public officials

14   must be charged with knowledge of it."  *See Elliot-Park v. Manglona*, 592 F.3d 1003, 1008–09

15   (9th Cir. 2010) (quotation omitted).

16         Rather than arguing that this constitutional right was not clearly established, Defendants

17   simply challenge Plaintiff's version of events.  *See* Dkt. No. 135 at 7–10.  Defendants urge that

18   San Quentin already had policies in place allowing separate showers for transgender women and

19   Plaintiff's requests were not denied; Plaintiff's PREA complaint was investigated using proper

20   procedures, free from any insults or targeting; and Plaintiff's Urinalysis RVR similarly followed

21   protocol.  *Id.*  But even when assessing qualified immunity at this stage, the Court must still

22   ─────────────────────

23   [7] The Court has reservations that Plaintiff may also try to sidestep the limitations on private rights
     of action under PREA by bootstrapping it into a constitutional claim.  *See, e.g.*, Dkt. No. 125 at 24

24   ("Defendants had a policy or custom of denying transgender women the PREA protection to
     shower separately."); *see also id.* at 33 ("Defendants Had Notice They Were Out of Compliance

25   with PREA."); Dkt. No. 136 at 3 (suggesting without any supporting authority that PREA may
     create a private right of action).  To the extent Plaintiff is suggesting that failing to comply with

26   PREA is a per se constitutional violation, she has provided no legal authority for this assertion.
     And even assuming PREA confers such rights, Plaintiff has provided no support that any such

27   rights were clearly established at the time.  Such issues, however, may be best addressed through
     jury instructions if the case proceeds to trial.
     [8] As an unpublished Ninth Circuit decision, *Hamso* is not precedent, but may be considered for its

28   persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

consider the facts in the light most favorable to Plaintiff.  *See Tolan*, 572 U.S. at 655–56.  And

Plaintiff has presented evidence disputing Defendants' versions of events.  For example, Plaintiff

has testified that she was repeatedly denied the right to shower separately from cisgender men.

Defendant Bloise told Plaintiff "[y]ou're no different from nobody else.  If you are wanting [a

shower] you shower with them."  *See* Smith Depo. at 191–92, 203 (89:23–90:7, 111:2–19); *see*

*also* Smith Decl. at ¶ 11.  To the extent Defendants disagree with Plaintiff's version of events, that

is a matter for the factfinder, and Defendants are free to probe this at trial.

### 3.  Due Process Claim

Following the Court's exhaustion analysis in Section II.B.i above, Plaintiff still has a

remaining due process claim against Defendant Feston for failure to make Plaintiff's witness

available during the Deadly Weapon RVR hearing.  As the Ninth Circuit has confirmed, "[an]

inmate facing disciplinary proceedings should be allowed to call witnesses and present

documentary evidence in his defense when permitting him to do so will not be unduly hazardous

to institutional safety or correctional goals."  *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974).

Additionally, "the Due Process Clause of the Fourteenth Amendment requires that prison officials

at some point state their reason for refusing to call witnesses requested by an inmate at a

disciplinary hearing."  *Ponte v. Real*, 471 U.S. 491, 492 (1985).

Here again, Defendants only appear to challenge the underlying facts.  *See* Dkt. No. 135 at

10–11.  Defendants contend that Defendant Feston did not refuse to call Plaintiff's witness,

claiming instead that prison officials could not locate him.  *See* Dkt. No. 135 at 11; *see also* Dkt.

No. 109-3 at ¶ 11.  They also urge that any due process violation was cured by reissuing and

rehearing the RVR.  *See* Dkt. No. 117 at 20–21.  But there appears to be a factual dispute about the

witness's availability at the time.  In the disciplinary hearing results for the Deadly Weapon RVR,

Defendant Feston, as the Senior Hearing Officer, listed evidence to support his findings.  *See* Dkt.

No. 109-1, Ex. B at 14–15.  In these notes, Defendant Feston indicated that Plaintiff had asked for

a witness, "Inmate Shoemake," to be interviewed and present at the hearing.  *Id.* at 15.  The notes

do not indicate whether this witness was present at the hearing or, if not, why he was absent.

However, the notes appear to include a question to—and answer from—Plaintiff's witness as well

United States District Court
Northern District of California

as the number of his cell. *See id.* at 15.  When asked whether there was any reason that Plaintiff

needed a weapon, he answered "no."  *Id.*  It is not clear whether this question was posed to

Plaintiff's witness before or after the hearing, or whether Plaintiff had further questions for him at

the time.  In any event, Plaintiff has suggested that her witness was no longer available at the time

of the rehearing.  The Court notes that Plaintiff does not describe what additional information her

witness could have provided at the rehearing, which will be necessary when evaluating any

resulting prejudice.  Neither Plaintiff not Defendants proffer a thorough analysis of this claim, and

the Court will not address arguments that have not been clearly presented.  But this issue

highlights the need for the parties to focus and clarify their many disputes and legal arguments,

and it will be on them to do this not-yet-done work if this case proceeds to trial.

### 4.  Retaliation Claim

There are factual disputes that preclude a finding of qualified immunity as to Plaintiff's

retaliation claim as well.  Defendants suggest that they were not on notice that they were somehow

precluded from searching Plaintiff's cell or adjudicating the RVRs "she actually committed."  *See*

Dkt. No. 135 at 12–13.  But again, Defendants entirely sidestep Plaintiff's allegations.  Despite

Defendants suggestion otherwise, the basis for Plaintiff's RVRs is not "undisputed and objective."

*Id.* at 13.  Plaintiff has alleged, for example, that Defendants (1) forced her to sign the form that

she was refusing a urinalysis and (2) falsified evidence in her cell regarding the deadly weapon

and marijuana.  *See* Smith Decl. at ¶ 18.  Defendants' disagreement over these alleged facts simply

underscores why summary judgment is improper.

*        *        *

There are factual disputes that preclude a finding of qualified immunity, and the Court

**DENIES** the motion on this basis.

### iii.    Physical Harm

Defendants next argue that Plaintiff cannot sustain any of her claims because she has not

suffered any physical injury as a result of Defendants' conduct.  *See* Dkt. No. 117 at 8–9.  The

PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison,

or other correctional facility, for mental or emotional injury suffered while in custody without a

23

prior showing of physical injury." 42 U.S.C. § 1997e(e). The physical injury "need not be significant but must be more than *de minimis*." *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002). However, Plaintiff testified during her deposition that Cuba groped her breasts and buttocks "every time [she] walked by him," and they were in adjacent cells. *See* Smith Depo. at 159 (16:6–16:14). To the extent Defendants argue that this conflicts with Plaintiff's earlier reports, that simply highlights a factual dispute inappropriate for the Court to resolve at this stage. Moreover, while 42 U.S.C. § 1997e(e) bars prisoner civil rights suits for mental or emotional injury suffered while in custody without a prior showing of physical injury, this prohibition does not apply to claims for declaratory or injunctive relief or for nominal or punitive damages. *See Zehner v. Trigg*, 133 F.3d 459, 461–64 (7th Cir. 1997). The Court **DENIES** the motion on this basis.

### iv.    Merits of Claims

Turning to the merits of Plaintiff's claims, Defendants devote substantial time arguing that they are entitled to summary judgment by discounting or wholly ignoring Plaintiff's version of events. *See* Dkt. No. 117 at 11–26. But as detailed in the Background section, Section I *supra*, Plaintiff has provided evidence that her requests for separate showers were repeatedly denied, Defendants responded to her PREA complaint with insults and targeting, and Defendants manufactured RVRs when Plaintiff complained about conditions for transgender women and initiated the PREA complaint. It is not the Court's role to resolve any factual disputes as to these issues. Plaintiff has raised at least one factual dispute precluding summary judgment on these claims. The Court **DENIES** the motion for summary judgment on this basis.

### i.    Injunctive Relief

In challenging Plaintiff's Failure to Protect claim against Defendants Diaz and Davis, Defendants also argue that Plaintiff is not entitled to any of the injunctive relief she seeks. *See* Dkt. No. 117 at 11–15.

*First*, Defendants argue that Plaintiff's request for relief is moot because Plaintiff is no longer housed at San Quentin, but was transferred to the California Medical Facility in June 2019. *See* Smith Decl. at ¶¶ 2, 27; Dkt. No. 109-1, Ex. F at 183–215.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

"When an inmate has been transferred to another prison and there is no reasonable expectation nor demonstrated probability that [s]he will again be subjected to the prison conditions from which [s]he seeks injunctive relief, the claim for injunctive relief should be dismissed as moot." *Brown v. Amis*, No. 16-CV-00603-HSG (PR), 2018 WL 3159224, at *2 (N.D. Cal. June 28, 2018) (citing *Dilley v. Gunn*, 64 F.3d 1365, 1368–69 (9th Cir. 1995) and *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012)).  A claim that the inmate might be transferred back to the prison where the injury occurred is too speculative to overcome mootness. *Dilley*, 64 F.3d at 1369.  The fact that other inmates will continue to be subject to the allegedly improper policies also does not overcome mootness because those inmates can bring their own cases. *Alvarez*, 667 F.3d at 1065.

In response, Plaintiff asserts that her claims for injunctive relief are not moot because she "is still subject to the conditions that gave rise to her suit." *See* Dkt. No. 125 at 18.  She suggests that CDCR's DOM, which used the word "biological sex" rather than "gender" in the context of its shower policies, were "system wide" and Defendant Diaz as the CDCR Secretary was in charge of that policy. *See id.* (citing *Walker v. Beard*, 789 F.3d 1125, 1132 (9th Cir. 2015)).  She has also alleged that she "continue[s] to have problems accessing privacy in the showers and while changing at CMF." *See* Smith Decl. at ¶ 27.  Plaintiff is also still seeking to transfer back to San Quentin.  At least as of late 2022, Plaintiff was eligible to be transferred back to San Quentin based on her classification score. *See* Dkt. No. 125-1, Ex. K at 111.  Based on the evidence presented, the Court cannot conclude that Plaintiff's request for injunctive relief is moot.

*Second*, Defendants argue that Plaintiff's requested relief is inappropriate and too broad. *See* Dkt. No. 117 at 14–15.  They argue, for example, that San Quentin is in compliance with PREA are her rights were not violated. *Id.*  Under the PLRA, "a federal district court may not order 'prospective relief' unless it finds the relief is 'narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" *Kelly v. Wengler*, 822 F.3d 1085, 1095 (9th Cir. 2016) (quoting 18 U.S.C. § 3626(a)(1)(A) and citing 18 U.S.C. § 3626(g)(7)).  However, in light of the issues of material fact already noted above, the Court finds it premature to address Plaintiff's entitlement to injunctive relief, or whether the relief she seeks is or can be narrowly drawn.  The

25

1  Court therefore **DENIES** the motion for summary judgement on this basis as well.

2  ## III.    MOTION TO EXCLUDE EXPERT

3         Plaintiff also moves to exclude the testimony of Defendants' expert, Captain Rusty

4  Hickethier.  Dkt. No. 108.  Plaintiff states that Defendants first designated Captain Hickethier as a

5  Federal Rule of Civil Procedure 30(b)(6) deponent, then disclosed him as a non-retained expert,

6  and finally as a retained rebuttal expert.  *See id.* at 1.  Plaintiffs urge that he is not a proper expert

7  and should not be allowed to testify at trial.  *See generally* Dkt. No. 108.  In response, Defendants

8  have confirmed that they do not oppose Plaintiff's motion to exclude Captain Hickethier as a non-

9  retained expert witness.  *See* Dkt. No. 123 at 1.  The Court therefore **GRANTS** the motion on this

10  basis.  The parties dispute, however, whether to exclude Captain Hickethier as a rebuttal expert

11  witness.  *Compare* Dkt. No. 108, *with* Dkt. No. 123.

12  ### A.    Legal Standard

13         Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion

14  or otherwise" where:

15

16         (a) the expert's scientific, technical, or other specialized knowledge
           will help the trier of fact to understand the evidence or to determine a
17         fact in issue; (b) the testimony is based on sufficient facts or data;
           (c) the testimony is the product of reliable principles and methods;
           and (d) the expert's opinion reflects a reliable application of the
18         principles and methods to the facts of the case.

19

20  Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and

21  reliable.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  "[R]elevance

22  means that the evidence will assist the trier of fact to understand or determine a fact in issue."

23  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558,

24  564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes

25  primarily to relevance.") (quotation omitted).  Under the reliability requirement, the expert

26  testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant

27  discipline." *Primiano*, 598 F.3d at 565.  To ensure reliability, the Court "assess[es] the [expert's]

28  reasoning or methodology, using as appropriate such criteria as testability, publication in peer

United States District Court
Northern District of California

1  reviewed literature, and general acceptance." *Id.* at 564.

2    **B.**  **Discussion**

3     Here, Plaintiff argues that Captain Hickethier's testimony should be excluded, even as a

4  rebuttal expert, because it is neither relevant nor reliable. *See* Dkt. No. 108 at 10–14.

5  Specifically, Plaintiff urges that Captain Hickethier's proffered testimony contradicts his 30(b)(6)

6  testimony and is unhelpful to the trier of fact. *See id.* In short, Plaintiff argues that Captain

7  Hickethier cannot offer an opinion that San Quentin was compliant with PREA requirements

8  because the evidence in the record—including Captain Hickethier's 30(b)(6) testimony—

9  establishes that it was not. *Id.* at 10–12. Plaintiff also urges that, although not prohibited, it would

10  be confusing to the jury to have someone testifying as both a 30(b)(6) witness and an expert. *See*

11  *id.* at 12–14.

12     Defendants do not address Plaintiff's arguments directly. Instead, they respond that to the

13  extent Plaintiff's expert is allowed to testify about PREA, they should be allowed to call Captain

14  Hickethier, a member of CDCR's PREA Compliance Unit, as a rebuttal expert witness.[9] *See* Dkt.

15  No. 123 at 2–4; Dkt. No. 108-1, Ex. 5 at 1. The Court has concerns with the cursory manner in

16  which Defendants have responded to this motion. And it is not clear whether, and to what extent,

17  Captain Hickethier may try to contradict his own prior 30(b)(6) testimony. Nevertheless, the

18  Court is not inclined to fashion an order based on suppositions about what the evidence at trial

19  may show, and how Captain Hickethier may rely on that evidence, in fashioning any rebuttal

20  testimony. The Court **DENIES** the motion to exclude him as a rebuttal expert.

21     Plaintiff may of course challenge any of Captain Hickethier's testimony through vigorous

22  cross-examination if he testifies, and the Court will have the opportunity to evaluate any

23  objections in context. Additionally, if this case proceeds to trial, the Court will consider holding a

24  voir dire hearing outside the presence of the jury to confirm in advance that experts, including

25  Captain Hickethier, will only offer reliable and relevant opinions. At this time, the Court

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  [9] To the extent Defendants argue in their opposition brief that Plaintiff's expert witness should not be allowed to testify about PREA, Dkt. No. 123 at 2–3, Defendants did not file a *Daubert* motion and the Court declines the invitation to convert their opposition brief into one.

United States District Court
Northern District of California

1    **GRANTS** the motion to exclude Captain Hickethier's testimony as a non-retained expert witness,

2    but **DENIES** the motion to exclude his testimony as a rebuttal expert.

3    **IV.    CONCLUSION**

4    As detailed above, the Court **GRANTS IN PART** and **DENIES IN PART** the motion for

5    summary judgment.  Dkt. No. 117.  The Court also **GRANTS IN PART** and **DENIES IN PART**

6    the motion to exclude Defendant's expert testimony.  Dkt. No. 108.

7    The Court further **SETS** case an in-person case management conference on April 22, 2025,

8    at 3:00 p.m. in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA.  The parties are further

9    **DIRECTED** to file a joint case management statement by April 15, 2025.  The parties should be

10    prepared to discuss how to move this case forward expeditiously, including the schedule for the

11    evidentiary hearing on exhaustion, pretrial conference, and jury trial.

12    **IT IS SO ORDERED.**

13    Dated:    3/31/2025

14

15    HAYWOOD S. GILLIAM, JR.
      United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

28